UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

United States of America,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )      File No. 1:18-mj-44
                               )
Javish Javi Murshedi,          )
                               )
                Defendant.     )

<u>TRANSCRIPT OF DIGITAL RECORDING OF</u>
<u>PRELIMINARY HEARING AND DETENTION HEARING</u>

Taken at
United States Courthouse
Bismarck and Fargo, North Dakota
February 15, 2018

BEFORE THE HONORABLE ALICE R. SENECHAL
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

<u>APPEARANCES</u>

MR. JONATHAN J. O'KONEK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699

                              FOR THE UNITED STATES



                    - - - - - - - - -



MS. MICHELLE ANN MONTEIRO
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

                              FOR THE DEFENDANT



                    - - - - - - - - -

GOVERNMENT WITNESS

Page No.

Sergeant Cody Smith
  Direct Examination by Mr. O'Konek        5
  Cross-Examination by Ms. Monteiro      25
  Redirect Examination by Mr. O'Konek   34

- - - - - - - - - -

EXHIBITS

| No. | Description | Offered | Received |
|-----|-------------|---------|----------|
| 1 | Photograph of Injuries | 10 | 10 |
| 2 | Photograph of Injuries | 10 | 10 |
| 3 | Photograph of Injuries | 10 | 10 |

- - - - - - - - - -

Certificate of Court Reporter - Page 43

- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2   Honorable Alice R. Senechal, United States District Court

3   Magistrate Judge, presiding, commencing at 10:00 a.m.,

4   Thursday, February 15, 2018, in the United States Courthouse,

5   Bismarck and Fargo, North Dakota.  The following proceedings

6   were had and made of record by audiovisual means and digitally

7   recorded with counsel and the defendant present.)

8                  - - - - - - - - - - -

9          THE COURT:  Today is February 15, 2018.  It is

10  10:00 a.m.  We're here for Case Number 1:18-mj-44.  That is

11  *United States of America versus Javish Javi Murshedi*.  I am

12  presiding from the courtroom in Fargo.  All the other hearing

13  participants are in the courtroom in Bismarck.  Jonathan

14  O'Konek is there representing the United States.  Mr. Murshedi

15  is there and is represented by Michelle Monteiro of the Federal

16  Public Defender's Office.  And I believe Bailey Kruger is also

17  there from the pretrial services office, is that correct?

18         MR. O'KONEK:  Yes, Your Honor.

19         THE COURT:  All right.  We're scheduled this morning

20  for a preliminary hearing and also a hearing on the

21  government's motion for detention pending conclusion of the

22  case.

23         Well, Mr. O'Konek, you may proceed.

24         MR. O'KONEK:  Yes, Your Honor, the United States

25  would call Sergeant Cody Smith.

                                4

1          THE COURT:  I think it probably works best if you

2    stay at that table, maybe move to the edge of it, closer to the

3    jury box, and get a microphone in front of you.  Well, the two

4    of you are going to have to share a microphone, huh?

5          MR. O'KONEK:  We'll have to -- we can figure it out,

6    Your Honor.

7          THE COURT:  I'm sure you can.  Okay.  Would you

8    please stand, and the clerk will give you an oath?  Please

9    raise your right hand.

10                    SERGEANT CODY SMITH,

11   having been first duly sworn, was examined and testified as

12   follows:

13          THE COURT:  Thank you.  Be seated, please.

14                    DIRECT EXAMINATION

15   BY MR. O'KONEK:

16   Q.   Now, Sergeant Smith, I just have a couple of questions

17   about your background and experience.  Where are you currently

18   employed?

19   A.   I am currently employed with the Three Affiliated Tribes

20   Police Department.

21   Q.   And what is your duty position?

22   A.   I am a canine sergeant.

23   Q.   And what are your duty responsibilities?

24   A.   Maintain patrol over the Fort Berthold Reservation,

25   respond to emergency calls, general traffic, and dealing with

1   narcotics on the reservation.

2   **Q.**   Now, which portion of Fort Berthold -- it's kind of a big

3   place, but what portion do you mainly cover?

4   **A.**   I mainly cover the Twin Buttes area, the south, I guess,

5   third of the reservation.

6   **Q.**   And Twin Buttes -- how many people live in Twin Buttes?

7   **A.**   Between two and three hundred, if I'm correct.

8   **Q.**   And just to kind of jump ahead a little bit, on February

9   10th of this year, were you on duty that day?

10  **A.**   I was on duty on that day.  I ended up getting called

11  early.

12  **Q.**   Okay.  And I want to talk a little bit about how you got

13  called out.  What did dispatch tell you was going on on that

14  day?

15  **A.**   They advised me that there had been a stabbing.

16  **Q.**   And what did you do -- or approximately what time was that

17  on that February 10th?

18  **A.**   Just a few minutes after 1:00 p.m.

19  **Q.**   And what did you do once you received that dispatch call?

20  **A.**   I proceeded to get ready in my uniform and my patrol

21  vehicle and head to the address I was given.

22  **Q.**   Okay.  And where -- not necessarily going to the exact

23  address, where in Twin Buttes were you dispatched to?

24  **A.**   The area is referred to as the CDC Trailer Court,

25  Community Development Center Trailer Court.

1   **Q.**   Okay.  And when you arrived on scene, tell us what you

2   discovered.

3   **A.**   When I arrived on scene, one of my other offices was

4   already present.  And there's two trailers that are parallel,

5   side by side, one being the suspect at the time, and the

6   victims.  They're approximately 15 feet part.  And when I

7   arrived, I pulled up, and Officer Ana Alvarez was at the side

8   entrance door talking to individuals inside the house.

9   **Q.**   Now, Officer Ana Alvarez, do you know approximately how

10  long she was on scene before you arrived?

11  **A.**   I -- I don't know the exact amount of time.  I'm guessing

12  maybe five minutes.

13  **Q.**   Did you speak with Ana, Ms. -- or, excuse me.  Did you

14  speak with Officer Alvarez about what had happened?

15  **A.**   Yes, I did.

16  **Q.**   And what did Officer Alvarez inform you?

17  **A.**   She advised me that there had been a conflict between

18  Shannon Beston and Coya Walker and the suspect here, Javish

19  Murshedi, and Zac Walker.

20  **Q.**   Okay.  And I want to break, I guess, those four

21  individuals down.  Now, prior to this date had you been aware

22  of any other, I guess, disagreements or conflicts between

23  Shannon Beston, Mr. Murshedi and Zachariah Walker and Coya

24  Walker?

25  **A.**   Not between Shannon Beston and Javish Murshedi and Zac and

1    Coya Walker, but other family members of the Walkers.

2    **Q.**   Had there been, I guess, disagreements between two

3    families?

4    **A.**   Yes.

5    **Q.**   And by "families," I mean the Bestons and the Walkers.

6    **A.**   There had been disagreements between them, yes.  Most of

7    the things that I was aware of was between the Bestons,

8    Murshedi and the Starrs.

9    **Q.**   Okay.  And --

10           THE COURT:  I'm sorry.  I didn't catch the last name

11   you said.

12           THE WITNESS:  I'm sorry.  Most of the disagreements

13   that I had been made aware of was between Shannon Beston,

14   Javish Murshedi, and the Starr family.

15   **Q.**   (MR. O'KONEK CONTINUING)  And --

16           THE COURT:  And the which family?

17           THE WITNESS:  Starr.

18           THE COURT:  Starr.  Okay.  Thank you.

19   **Q.**   (MR. O'KONEK CONTINUING)  And who particularly in the

20   Starr family?

21   **A.**   There's two individuals, Alyssa Starr and Devon Starr.

22   **Q.**   Are they related in any way to the -- to the Walkers?

23   **A.**   My understanding is they're cousins, but I'm not exactly

24   sure what the relation is.

25   **Q.**   And I want to take you back to the time in September of

                                    8

1  last year.  Was there an altercation between Devon Starr and
2  the Beston family?
3  **A.**   Yes, there was.
4  **Q.**   And where was that at?
5  **A.**   At the gas station in Twin Buttes, the C-Store.
6  **Q.**   At some point during this altercation between Devon Starr
7  and -- correct me if I'm wrong, but it was a James Beston?
8  **A.**   My understanding, that's who it was between.
9  **Q.**   Did Mr. Murshedi appear during that confrontation?
10  **A.**   From my understanding -- I was not involved in that
11  incident at all, but from what has been relayed to me and
12  through reports, yes.
13  **Q.**   And what -- from the information you received from other
14  officers, what did Mr. Murshedi do during this September 2017
15  incident?
16  **A.**   There was a fight that transpired between Devon Starr and
17  James Beston.  At some point Devon had taken out a firearm.
18  The firearm was taken away from him, and at some point it's
19  been alleged that Mr. Murshedi had gotten a hold of the firearm
20  and pointed it at Devon Starr.
21  **Q.**   Now, going back to February 10th of 2018, knowing all of
22  this information, when -- when Ms. Alvarez -- Officer Alvarez
23  tells you there had been a stabbing, did she say who had
24  stabbed whom?
25  **A.**   She stated to me that Zac Walker had been stabbed by

9

1   Javish Murshedi.

2   **Q.**   Okay.  And after you get this information, what do you do

3   next?

4   **A.**   We had waited for EMTs to arrive on scene to attend to the

5   wounds on Zac, just secured the perimeter, waiting to get --

6   gather more information to determine whether it was safe or not

7   to try to make contact with the occupants in Shannon Beston's

8   residence.

9   **Q.**   I'm showing defense counsel Government's Exhibits 1, 2 and

10   3.  These are photographs, I believe, that Ana -- Officer Ana

11   Alvarez had taken of Zachariah Walker's injuries?

12   **A.**   Yes.

13   **Q.**   Now I want you to look at all three of those exhibits.

14   Are those exhibits a fair and accurate depiction of the

15   injuries that Ms. Alvarez -- or Officer Alvarez had described

16   to you belonging to Mr. Walker?

17   **A.**   Yes.

18           MR. O'KONEK:  At this time, Your Honor, I'd request

19   to admit Government's Exhibits 1, 2 and 3.

20           MS. MONTEIRO:  No objection.

21           THE COURT:  Thank you.  Exhibits 1, 2 and 3 are

22   received.  And I'll just note that I received them via e-mail

23   prior to the hearing, and I think one of them was also attached

24   to the Complaint, so those three exhibits are received.

25           MR. O'KONEK:  Yes, Your Honor.

1   **Q.**   (MR. O'KONEK CONTINUING)   Now, Government's Exhibit 1,

2   what's depicted in that photograph?

3   **A.**   I believe that is going to be Zac Walker's left arm with a

4   large cut across it.

5   **Q.**   And Government's Exhibit 2?

6   **A.**   That will be Zac Walker's left hand with what appeared to

7   be either cuts or scrapes that are bleeding on his fingertips.

8   **Q.**   And then Government's Exhibit 3, what's depicted in that

9   photograph?

10  **A.**   Again, Zac Walker's left hand.   It looks like actually

11  pieces of skin missing from the fingertips.

12  **Q.**   Okay.   Now, at some point did you speak with Mr. Zachariah

13  Walker?

14  **A.**   That day, just very briefly, and it was just in regard --

15  after the EMTs had actually attended to him, we wanted to get

16  everybody out of the residence before trying to make contact

17  with the Beston residence.   And he had stated that he did not

18  want to exit out the door that was facing Bestons' house, so we

19  actually had to remove a bunch of belongings that were in front

20  of the back door so we could get him out the back door.

21  **Q.**   And why didn't Mr. Zachariah Walker want to leave the

22  house?

23  **A.**   He stated he was afraid for his life.   He stated that

24  being that he had just been stabbed, he was worried that if

25  they were going to do that, what would stop them from shooting.

1  **Q.**   Now I want to back up a little bit.  You said "they" had

2  -- somebody had stabbed him.  Did Mr. Zachariah Walker state

3  who had stabbed him?

4  **A.**   He had stated that it was Javish Murshedi.

5  **Q.**   And at some point you had said earlier -- did anybody else

6  speak with Mr. Walker before you?

7  **A.**   Yes, Officer Alvarez did.

8  **Q.**   And did she relay to you the information or have you read

9  a report of the information that Mr. Zachariah Walker told her

10  about the incident?

11  **A.**   Yes.

12  **Q.**   And what did Zachariah Walker tell Officer Alvarez about

13  what had happened that day?

14  **A.**   That he had come home from work for lunch.  I'm sorry,

15  that Mr. Walker had come home from work for lunch, and upon

16  arriving to the residence, Mr. Murshedi was sitting outside and

17  in his words he was mean-mugging him as he come by, and they

18  started in a verbal altercation and then proceeded to get into

19  a fight after more family members walked outside.

20  **Q.**   And who were those family members?

21  **A.**   His mother, Coya Walker; his father, Mickey Walker,

22  Michael, but he goes by Mickey; and his girlfriend.  I don't

23  know what her name is.  I've never spoke with her at all.  And

24  then he also stated that that Shannon Beston had come outside,

25  and then shortly after James Beston had arrived.

1   Q.   And so just kind of, I guess, set the -- the stage here as

2   to what had happened.  The trailer park that you talked about,

3   how close are the Beston family located near the Walker family?

4   A.   They -- like I said, it's -- the two trailers both run

5   north and south.  They're parallel to each other, approximately

6   15 feet apart.

7   Q.   And so on one side you have the Beston family, James

8   Beston, Shannon Beston and Mr. Murshedi, is that right?

9   A.   It would be Shannon Beston and Mr. Murshedi, but James

10  does not reside at that residence.

11  Q.   And so at this time -- I apologize -- it was Mr. Murshedi

12  and Shannon Beston on one side?

13  A.   Yes.

14  Q.   And then on the other side of the trailer park -- or next

15  to it is Coya Walker, Zachariah Walker and Michael, Mickey,

16  Walker.

17  A.   Correct.

18  Q.   So at some point, the information that's been conveyed to

19  you, what happened next after these individuals are getting

20  into an argument?

21  A.   They were -- would have been on the north side of the

22  trailers near the car that was parked there.  And Mr. Murshedi

23  and Zac Walker got into a fistfight, is my understanding.  And

24  at that time Shannon Beston and Coya Walker then also got into

25  a fistfight.  And while the fight was ensuing, Mr. Murshedi

1  eventually removed a large knife, from the way they described

2  it, from like the swell of his back.

3  **Q.**  And who's "they" that described it?

4  **A.**  Coya Walker, Zac Walker, and Mickey Walker.

5  **Q.**  Okay.  So Coya, Zac and Michael, Mickey Walker, all

6  described that Mr. Murshedi grabbed a knife from the side of

7  his hip.

8  **A.**  Yes.

9  **Q.**  Did they describe what it looked like?

10  **A.**  They described it as like a large hunting knife or a mini

11  machete.

12  **Q.**  Do you know what (inaudible) machete?

13  **A.**  Well, they were describing it as approximately 14 to 18

14  inches in length, overall length.  They said it was black in

15  color and had a white stripe around the handle at some point.

16  **Q.**  And so when you're talking with Zachariah Walker -- excuse

17  me, that Officer Alvarez was talking to Zachariah Walker, did

18  Mr. Walker describe what Mr. Murshedi was doing with the knife?

19  **A.**  Initially when he took it out, he pulled it out in a

20  swinging fashion to swing it at him, and he said he raised up

21  his arm to block it.

22  **Q.**  Who raised up their arm?

23  **A.**  Zac did, Zac Walker.

24  **Q.**  So just to be clear, Mr. Murshedi swings a knife at

25  Mr. Walker, and Mr. Walker blocks it with his arm?

1  **A.**   Yes.

2  **Q.**   And then what happened?  What did Mr. Walker say happened

3  after that?

4  **A.**   He stated that he jumped back after he was initially hit.

5  He didn't realize at first that he was struck by a sharp

6  object.  He said that Mr. Murshedi then started to swing this

7  object at him again, being the knife, and he was able to dodge

8  it and then took off running.

9  **Q.**   And after Mr. Walker takes off running, what does Mr.

10  Murshedi do?

11  **A.**   Chased him.

12  **Q.**   And how is he chasing him?

13  **A.**   Running directly behind him, in pursuit of him.

14  **Q.**   Does he still have the knife at this point?

15  **A.**   Yes.

16  **Q.**   And I want to talk a little bit about what had happened

17  between Shannon Beston and Coya Walker.  What -- what was

18  described as the incident involving those two during the time

19  that Mr. Murshedi is chasing Mr. Walker with the knife?

20  **A.**   It was described to me through Officer Alvarez as -- the

21  statements portrayed to Officer Alvarez was that Shannon Beston

22  just assaulted Coya Walker, stating that she just went up to

23  her and started punching her in the face.  Statements by Coya

24  was that Shannon had grabbed a hold of her jacket and was

25  giving her uppercuts to the face.

1   **Q.**   Did Coya Walker have any injuries to her?

2   **A.**   Yes, she did.

3   **Q.**   And what were those injuries?

4   **A.**   Severe bruising around her face.

5   **Q.**   Okay.  And kind of going back a little bit, did Coya see

6   Mr. Murshedi do anything to Mr. Walker?

7   **A.**   From her statements, yes.

8   **Q.**   What did she see?

9   **A.**   She saw Mr. Murshedi take out a knife and swing it at Zac

10   Walker and striking him in the arm.

11   **Q.**   And I think you've stated earlier, but Ms. Coya Walker is

12   the mother of Zachariah Walker.

13   **A.**   Yes.

14   **Q.**   All right.  And at some point -- when you arrived on

15   scene, was Mr. Murshedi there?

16   **A.**   No, he was not.

17   **Q.**   Let's talk a little bit about what you did next.  So you

18   get this information.  You speak with Mr. Zachariah Walker.

19   What else do you do?

20   **A.**   After speaking with just Zac, like I said, briefly, we got

21   him out of the residence.  I actually got the car keys from him

22   because he'd refused to go to the -- it would be the west side

23   of the house, which was directly in between the two residents,

24   so I drove the vehicle down to the east side of the house so

25   they could all get in the vehicle; "they" being Zac Walker,

16

1   Coya Walker, Mickey Walker, and then Zac's girlfriend, to head

2   to the hospital.  Upon them leaving the scene and nobody being

3   in their residence anymore, myself and one of the deputies --

4   there were three deputies that arrived on scene.

5   **Q.**   Deputies from where?

6   **A.**   Dunn County.  I do not know what their names were, but we

7   then made contact at the Shannon Beston residence.

8   **Q.**   Okay.  And before I go too far, now, the area where this

9   trailer park is located on -- in Twin Buttes, is that on the --

10  within the exterior boundaries of the Fort Berthold Indian

11  Reservation?

12  **A.**   Yes, it is.

13  **Q.**   And to your knowledge, is Zachariah Walker an Indian

14  person?

15  **A.**   Yes, he is.

16  **Q.**   Enrolled at the Fort Belknap in Montana?

17  **A.**   Yes.

18  **Q.**   To your knowledge, is Mr. Murshedi a Indian person?

19  **A.**   No.

20  **Q.**   Is he enrolled in any federally-recognized tribes?

21  **A.**   Not that I'm aware of.

22  **Q.**   So after the Walker family leaves, you said you approached

23  the Beston family.

24  **A.**   Yes.

25  **Q.**   Specifically Shannon Beston?

17

1   **A.**    Yes.

2   **Q.**    Tell -- take us through what happened.

3   **A.**    I approached the -- it would be the west side door, which

4   is the front entrance of the residence.  I knocked on the door.

5   Shannon did answer the door.  I'd asked her to step outside,

6   and she had grabbed a coat and then came outside.  And I asked

7   her if Javish Murshedi was there, and she stated, no, he was

8   not.

9   **Q.**    Did she tell you anything else about what started this

10  altercation?

11  **A.**    At that moment, no.

12  **Q.**    At any point did she?

13  **A.**    Yes, she did.  She had stated that the Walker family was

14  always, in her words, starting shit.  They would be very loud

15  at nighttime, would be pounding on the side of their trailer.

16  **Q.**    Driving on her property?

17  **A.**    She did at one point state that they had driven on the

18  property, yes.

19  **Q.**    And did she describe what had happened during the

20  altercation?

21  **A.**    At that moment she didn't really describe much at all.  It

22  was much later on she had described it to Detective Bowen.

23  **Q.**    And to your knowledge, do you know what she had said?  If

24  you don't know, that's okay.

25  **A.**    I don't know offhand, if I can look through --

1   **Q.**   We'll go into that in a bit.  Kind of going back in time,

2   you were talking to her.  Did you end up looking for Mr.

3   Murshedi in Shannon Beston's residence?

4   **A.**   Yes, I did.

5   **Q.**   And why did you do that?

6   **A.**   Given the circumstances and the nature, and everything, of

7   the assault that had taken place with the injuries, it was in

8   everybody's best interest to make sure we locate all parties

9   for two reasons; one, safety of the alleged victim and safety

10  of the alleged suspects.

11  **Q.**   And so did you -- I guess to qualify, did you kind of do a

12  protective sweep of the house?

13  **A.**   Yes, we did.

14  **Q.**   And what did you notice as you were going inside the

15  house?

16  **A.**   There were only two other occupants that were in the house

17  at the time -- well, I'm sorry, three other occupants.  When

18  Shannon came out of the house, I'd noticed that her brother,

19  James Beston, was in the living room, along with -- at the time

20  I did not know the male's name, and then a young teenage boy.

21  Those were the only individuals that we had located in the

22  house.

23  **Q.**   And did you find Mr. Murshedi in the residence?

24  **A.**   No, I did not.

25  **Q.**   Did you find anything else of note to this case in the

1   residence?

2   **A.**   Yes.  The deputies had advised me that they had found a

3   large knife sheath in the master bedroom.

4   **Q.**   And at that point, after you've kind of done a protective

5   sweep, do you guys leave the house?

6   **A.**   Yes, we did.

7   **Q.**   The -- I should call it the residence.  I apologize.

8   **A.**   Yes.

9   **Q.**   Did -- at that point did you ultimately -- or you or

10  somebody from the police department get consent to go into the

11  home?

12  **A.**   Yes, we did.

13  **Q.**   At first -- I just want to clarify -- did Ms. Beston give

14  consent?

15  **A.**   Initially, no, she did not.  When we were escorting her

16  back to the patrol vehicle, she said we could not go in the

17  house.

18  **Q.**   And at some point later did Detective Bowen of the Three

19  Affiliated Tribes ask her again?

20  **A.**   Yes.

21  **Q.**   And what did she say?

22  **A.**   She gave him verbal consent, and then I advised him to get

23  a written consent form.

24  **Q.**   And, now, at this point you still hadn't located Mr.

25  Murshedi, is that right?

1   **A.**   Correct.

2   **Q.**   Where do you find Mr. Murshedi?

3   **A.**   Actually, Shannon's mother returned back to the residence

4   and brought him there.

5   **Q.**   Okay.  And so what happens after the -- Mr. Murshedi is

6   brought back to the residence?

7   **A.**   Myself and Officer Alvarez walked out the residence and

8   went to her vehicle, which was a pickup truck, and Mr. Murshedi

9   was in the backseat.

10   **Q.**   Who were -- where -- where was Mr. Murshedi found?

11   **A.**   She stated that he was found approximately a mile east --

12   just to the east side of Twin Buttes, walking down a tree row.

13   **Q.**   And so did she say why she had brought Mr. Murshedi back?

14   **A.**   Yes, her statement was that after she picked him up, she

15   told him that he was guilty and needed to turn himself in.

16   **Q.**   And so Mr. Murshedi is brought back to you.  Do you speak

17   with him at all?

18   **A.**   I advised him that I was detaining him at that time.  I

19   placed him in the back of my patrol vehicle and read him

20   Miranda and advised him that Detective Bowen would be coming

21   out to speak with him shortly.

22   **Q.**   Did Detective Bowen speak with Mr. Murshedi?

23   **A.**   Yes, he did.

24   **Q.**   And did you also speak with him?

25   **A.**   I spoke with him about -- prior to transport.

1   Q.   At some point did you call -- you -- did somebody from

2   your office call -- contact the U.S. Attorney's Office?

3   A.   Yes.

4   Q.   And did you get permission to arrest Mr. Murshedi for

5   assault with a dangerous weapon?

6   A.   Yes.

7   Q.   And the reason I ask you that is, did you communicate that

8   to Mr. Murshedi?

9   A.   Yes, I did.

10  Q.   What happened shortly before -- after you communicated

11  that to Mr. Murshedi?

12  A.   Just prior to advising him of -- that I was placing him

13  under arrest for the offenses, he was allowed to speak with

14  Shannon's mother, which was Willa Incognito.  While he was

15  talking with Willa, he became very emotional, very upset over

16  the whole incident, and he started making statements and

17  comments of, if they want --

18  Q.   If you need to --

19  A.   May I look, because I believe that's quoted in here?

20  Well, Mr. Murshedi, he stated, "They want problems, I'm going

21  to bring them some fucking problems, man.  I'm going to go to

22  jail for a reason now.  Don't let me get a hold of them.  Don't

23  let me get a hold of them mother fuckers, man."

24  Q.   At any point did Mr. Murshedi talk to you about what

25  happened that day?

1   **A.**   Yes, he did.

2   **Q.**   What did he say?

3   **A.**   He advised that himself and Zac Walker had gotten into a

4   tussle towards the north of the trailers, between the car and

5   the propane tank.  He stated that as they were fighting, that

6   Zac then ran away from him and took off on him, and that he

7   kind of pursued him.

8   **Q.**   Were you -- did you clarify what he meant by "kind of

9   pursued him"?

10   **A.**   Going after him, chasing him.

11   **Q.**   Did he mention whether he had a knife or anything in his

12   hands?

13   **A.**   He did not.

14   **Q.**   Did he deny having a knife?

15   **A.**   I -- to be honest, I don't know if I ever asked him if he

16   had one or not.

17   **Q.**   Did you ever find a knife?

18   **A.**   No, we were not able to locate one.

19   **Q.**   Well, what steps did you take to try to find one?

20   **A.**   The following day myself and Detective Bowen had gone out

21   and went through the area, the field and everything where Mr.

22   Murshedi stated that he had been walking and left.  We were not

23   able to find any tracks out there through the area where he

24   said that he was walking and were not able to locate a knife

25   anywhere.  The residence had also been searched, and we were

23

1    not able to find it in the residence.

2    Q.   The last question I really have for you is, at some point

3    did you learn other -- more information about what potentially

4    happened to the knife?

5    A.   No.

6    Q.   Was there a point where you advised whether -- what -- how

7    Mr. Murshedi used the knife and might have lost it?

8    A.   While he was struggling with Zac Walker, Zac had stated

9    that when he was running away from Mr. Murshedi, he had tripped

10   over a mound of dirt and fell on the ground.  He said he -- in

11   his words, he stated he rolled over on his back, expecting

12   another attack to come and that Mr. Murshedi was chasing behind

13   him with the knife raised above his head, and as he brought his

14   arm back, it slipped off his hand.  He did state that he was

15   able to recover the knife and kept coming after him, but with

16   him trying to pick up the knife, he was able to get away from

17   him.

18   Q.   And is that in any of the reports, or will that be in a

19   supplement?

20   A.   That is in a supplemental.

21   Q.   And the last question I guess I have -- I apologize.  I

22   said that before, but did Mr. Zachariah Walker explain what he

23   felt -- what he thought would happen to him during this

24   incident?

25   A.   Yes, he had stated he thought he was going to be killed.

1          MR. O'KONEK:  Those are the only questions I have,

2     Your Honor.

3          THE COURT:  Thank you.  Ms. Monteiro, you may

4     cross-examine this witness.

5          MS. MONTEIRO:  Thank you.

6                         CROSS-EXAMINATION

7     BY MS. MONTEIRO:

8     Q.   So it seems as though there's a family feud going on here,

9     is that right?

10    A.   Yes, my understanding, it's been roughly one year in the

11    process.

12    Q.   Okay.  So for the last year there's been feuds going on

13    between these two families?

14    A.   Yes.

15    Q.   So we have on one side the Walker family, and they're

16    related to some -- you know, the Starr family, correct?

17    A.   Correct.

18    Q.   So I guess I'll call them the Walker-Starr family.  And

19    then on the other side we have the Beston family, correct?

20    A.   Correct.

21    Q.   And then Mr. Murshedi here, he is, I guess, a member of

22    that family because this Shannon Beston is his wife, correct?

23    A.   Correct.  I was not aware that they're married, but --

24    Q.   They're in a relationship, though.

25    A.   Yes.

                                25

1   Q.   And so there was a previous incident then that you

2   mentioned with the Starr family and the Beston family where a

3   gun was pulled, is that correct?

4   A.   Correct.

5   Q.   And this Devon Starr pulled a gun on James Beston?

6   A.   That is my understanding.

7   Q.   Okay.  And then Mr. Murshedi was there, and he was able to

8   wrestle the gun away from Mr. Starr?  Is that what happened?

9   A.   I don't know who it was that wrestled it away from him.  I

10  was just told that at some point in time Mr. Murshedi did have

11  possession of the firearm.

12  Q.   Okay.  But this Mr. Starr was the one that pulled out the

13  gun during the altercation.

14  A.   Correct.

15  Q.   And then are there some restraining orders going on

16  between these two families?

17  A.   Between the Bestons and the Starrs.

18  Q.   Okay.  So who's got restraining orders in the Starr -- or

19  in the Beston family against the Starrs?

20  A.   My understanding is that James Beston and Shannon Beston

21  have restraining orders against Devon Starr and Alyssa Starr.

22  I'm not positive that there's other individuals that are

23  incorporated in that or not.

24  Q.   So Devon Starr and Alyssa Starr are ordered then to stay

25  away from Shannon and James Beston.

1    A.    Correct.

2    Q.    So they obviously aren't allowed to go on Shannon Beston's

3    property, correct?

4    A.    Correct.

5    Q.    And Mr. Murshedi lives there with Shannon Beston?

6    A.    Yes.

7    Q.    But you're not aware whether the Walkers, who are related

8    to the Starrs -- do they have any -- are there any restraining

9    orders against them that you're aware of?

10   A.    Not that I'm aware of.

11   Q.    Okay.  So I think what I heard you say is that Zachariah

12   Walker said that he was -- I don't know if he was driving by,

13   but he claimed that Mr. Murshedi was mean-mugging him?

14   A.    Yes.

15   Q.    So what's that, giving him a dirty look?

16   A.    Yes.

17   Q.    So then this -- because supposedly Mr. Murshedi was giving

18   him a dirty look, that Zachariah then went over and confronted

19   Mr. Murshedi?  Is that what happened?

20   A.    No, it's -- my understanding was that Mr. Murshedi had

21   then stated to Zac -- asking him if everything was all right of

22   some sort, and Zac said, "Everything is fine.  Is everything

23   all right?"  And then they just continued to have a verbal

24   altercation.

25   Q.    Okay.  So then did Zac come to where Mr. Murshedi was?

1   A.   That, I don't have an exact clarification on.

2   Q.   Okay.  And did this altercation start on Mr. Murshedi's

3   property?

4   A.   My understanding, it would have started on the Walker

5   residence.

6   Q.   Okay.  Now, when you -- when you talked to Mr. Murshedi,

7   you said he was very upset and emotional because he was going

8   to go to jail and be charged?

9   A.   Yes.

10  Q.   Was he crying and upset, or what?

11  A.   On and off he had been, yes.

12  Q.   Okay.  Now, he also told you when you talked with him that

13  Mr. Walker had told -- during this altercation had told another

14  individual to get a firearm.

15  A.   Yes.

16  Q.   And Mr. Murshedi like took off and he was scared because

17  he thought these people were going to go get a gun.

18  A.   Yes.

19  Q.   And there obviously had been a previous incident where

20  this -- these people, the family, Starr-Walker family had

21  pulled a gun on Mr. Murshedi and the Beston family.

22  A.   The Starr family, yes.

23  Q.   Okay.  But you agree, though, that Starrs and the Walkers

24  are all one of -- part of one family.

25  A.   They are related, yes.

1  **Q.**   And they're together feuding with the Bestons and Mr.

2  Murshedi.

3  **A.**   At separate times, separate incidents, yes.

4  **Q.**   So it seems as though to me that after this altercation

5  started between Mr. Murshedi and Zachariah Walker -- did you

6  say that other family members that came then and got involved

7  in this situation?

8  **A.**   Yes.

9  **Q.**   Okay.  So Shannon started fighting physically with Coya

10  Walker, the mother?

11  **A.**   Yes.

12  **Q.**   And Shannon is three-months pregnant, is that correct?

13  **A.**   I'm under the impression that she is pregnant.  I do not

14  know how far along.

15  **Q.**   So we have Mr. Murshedi and Shannon.  Was there anybody

16  else from the Beston-Murshedi family that was involved in this

17  altercation?

18  **A.**   They were present.  James Beston was present.  My

19  understanding from what -- everything that had been relayed to

20  me, he was not involved in the altercation, anything more than

21  just verbally.

22  **Q.**   Okay.  And what members besides Zachariah and Coya Walker

23  were part of this altercation?

24  **A.**   Involved in the actual conflict was just those two.

25  Others were present, being Mickey Walker and then Zac's

1   girlfriend.

2   **Q.**   Okay.  So we have two other people that -- from the

3   Walker-Starr family.

4   **A.**   That were present, yes.

5   **Q.**   Okay.  But the only altercations that occurred were

6   between Mr. Murshedi and this Zac and then Shannon and Coya.

7   **A.**   Correct.

8   **Q.**   And did -- did these other two people that were present

9   from the Walker family give any type of statement to the police

10  about what had happened?

11  **A.**   They -- I do believe they gave statements to Officer

12  Alvarez.

13  **Q.**   Okay.  And what about James Beston?  Did he tell law

14  enforcement what happened?

15  **A.**   Yes, he had had an interview with Detective Bowen.

16  **Q.**   And do you know what he told them happened?

17  **A.**   He had stated that there was a confrontation between them.

18  He had stated that he was trying to be an intermediary and

19  tried to calm everybody down.  And between all of the different

20  statements, the only discrepancy between everybody's statements

21  was pretty much just the involvement of the knife.

22  **Q.**   So the people on the Beston side didn't mention anything

23  about a knife, is that --

24  **A.**   Correct.

25  **Q.**   But then on the Walker side, they were claiming there was

1   a knife.

2   **A.**   Correct.

3   **Q.**   And then you searched everywhere where Mr. Murshedi had

4   been, and you didn't find a knife anywhere.

5   **A.**   Correct.

6   **Q.**   Okay.  So you had mentioned that this Ms. Shannon Beston

7   has got a mother in the area, is that correct?

8   **A.**   Yes.

9   **Q.**   Where does the mother live in relation to these

10  Walker-Starr people, you know, if you know?

11  **A.**   She lives in the eastern side of town.  She actually would

12  live right near where she had stated that she found Mr.

13  Murshedi walking.

14  **Q.**   Okay.  So she doesn't live right next-door to the Walkers

15  and the Starrs.

16  **A.**   No, they're -- they're over a mile apart.

17  **Q.**   And then are you aware that there's a grandmother out

18  there of Shannon's that's living somewhere in the community?

19  **A.**   Yes, a few more miles east of town.

20  **Q.**   Okay.  So the grandmother also doesn't live anywhere in

21  the vicinity of the Walker-Starr family.

22  **A.**   She lives -- I guess I should restate that.  The mother

23  does live fairly close to one of the Starr family members,

24  approximately a quarter mile away, same as the grandmother.

25  She lives near some of the Starr residences.

1   **Q.**   But it seems like the mother and the grandmother's house,

2   though, is not directly next-door to any of these people, like

3   kind of --

4   **A.**   Where the incident took place, no.

5   **Q.**   Okay.  And Mr. Murshedi informed you that this gentleman

6   had hit him with a bat, is that correct?

7   **A.**   No, he actually never advised me that he was struck with a

8   bat.  He had advised at some point that Coya Walker had a bat,

9   but nobody had ever said that she hit anyone with it.

10   **Q.**   Okay.  So there's more to the story from, I guess, other

11   people talking to law enforcement because now we have something

12   about a bat coming into it, correct?

13   **A.**   That was mentioned the next day as well too.

14   **Q.**   Were there any other weapons mentioned, or --

15   **A.**   No.

16   **Q.**   And was there anything else mentioned about somebody

17   telling another -- one of the Walkers telling another one to go

18   get a gun?

19   **A.**   Yeah, that was mentioned.  That had already been

20   clarified.

21   **Q.**   And did that happen?

22   **A.**   Was the gun retrieved?

23   **Q.**   No, did --

24   **A.**   No.

25   **Q.**   Did the -- Zachariah Walker tell somebody to go get a gun?

1    A.    According to Mr. Murshedi, yes.

2    Q.    Okay.  And did any other witness report that that had

3    happened?

4    A.    I'm not sure if in the other interviews, that that was

5    mentioned or not.

6    Q.    Did you search the Walker home to see if there was -- if

7    they did have a gun?

8    A.    No, we have not had a chance to.

9    Q.    Is that something you intend to do, or --

10    A.    Yes, that is something that the detectives are looking

11    into.

12    Q.    Okay.  Are -- are they prohibited from possessing

13    firearms, to your knowledge?

14    A.    Yes, they are.

15    Q.    Does one -- Devon Starr, that had pulled out a gun during

16    this other incident, is he prohibited from possessing a

17    firearm?

18    A.    No, he's not.

19    Q.    Okay.  So he had a legal firearm.

20    A.    Yes.

21    Q.    But these other people are prohibited.

22    A.    Correct.

23          MS. MONTEIRO:  Okay.  Nothing further.  Thank you,

24    sir.

25          THE COURT:  Thank you.  Mr. O'Konek, any redirect?

1          MR. O'KONEK:  Just -- just briefly for clarification,

2    Your Honor.

3                      REDIRECT EXAMINATION

4    BY MR. O'KONEK:

5    Q.   Now, Sergeant Smith, were any members of the Starr family

6    present during this incident on February 10th?

7    A.   No, they were not.

8          THE DEFENDANT:  They drove by.  Tell them.  You saw

9    them drive by twice.

10         MS. MONTEIRO:  Be quiet.

11         THE DEFENDANT:  Tell them the truth.

12         THE COURT:  Excuse me.

13         MS. MONTEIRO:  It's not going to be helpful, okay?

14         THE COURT:  Excuse me.

15         THE DEFENDANT:  (Inaudible due to the microphone

16   crackling.)

17         THE COURT:  Mr. Murshedi?

18         THE DEFENDANT:  (Inaudible due to the microphone

19   crackling.)

20         MS. MONTEIRO:  It's not helping.

21         THE COURT:  Mr. Murshedi, first of all, I'm not able

22   to hear anything that you've said because of the connection,

23   but it is not appropriate to you -- for you to speak right now.

24   This is the time when Sergeant Smith is testifying.  You have

25   had a chance to cross-examine him through your lawyer, and now

                                  34

1  is the time for Mr. O'Konek to ask some questions on redirect.

2          And just because of the audio connection issues that

3  we have here, Ms. Monteiro, can we move the microphone away

4  from Mr. Murshedi so it doesn't pick up -- pick up unless he's

5  testifying or speaking?

6          MS. MONTEIRO:  Yes.

7          THE COURT:  Thank you.  Okay.  Mr. O'Konek, do you

8  have redirect?

9          MR. O'KONEK:  Yes, Your Honor.

10  Q.   (MR. O'KONEK CONTINUING)  Now, going back to who was all

11  present, I guess I'll just ask the question, the Starr family

12  was not present and in a physical altercation, is that right?

13  A.   Correct, they were not present during the physical

14  altercation at all.

15  Q.   Now, did you see any member of the Starr family when you

16  arrived?

17  A.   When I was speaking with Mr. Murshedi just prior to

18  transport, one of the Starr family members did drive by.

19  Q.   So this was how long after the incident?

20  A.   After the incident, it would have been several hours.

21  Q.   Okay.  So just to clarify a time when we have the Bestons

22  and the Walkers getting into an altercation, no member of the

23  Starr family was present.

24  A.   Correct.

25          MR. O'KONEK:  That -- that was the only question I

1   had, Your Honor.

2            THE COURT:  All right.

3            MS. MONTEIRO:  Nothing further, Your Honor.

4            THE COURT:  Thank you, Sergeant Smith.

5            Mr. O'Konek, is there additional evidence that you

6   wish to offer?

7            MR. O'KONEK:  No, Your Honor.  The government rests.

8            THE COURT:  Ms. Monteiro, do you wish to offer

9   evidence?

10            MS. MONTEIRO:  No, Your Honor.

11            THE COURT:  All right.  And I guess we should

12   clarify, do we want to address both the preliminary hearing

13   question and the pretrial detention question in argument at the

14   same time, or do you want to look at those separately?

15            MR. O'KONEK:  I believe we can take them up at the

16   same time, if that's amenable to the defense, Your Honor.

17            MS. MONTEIRO:  Yes.

18            THE COURT:  Okay.  Then I will ask Ms. Kruger -- I've

19   received your written report.  Other than that written report,

20   do you have anything else that you would wish to bring to the

21   Court's attention?

22            MS. KRUGER:  No, Your Honor.

23            THE COURT:  And, counsel, have you both had an

24   opportunity to review the pretrial services report?

25            MR. O'KONEK:  Yes, Your Honor.

1          MS. MONTEIRO:  Yes, Your Honor.

2          THE COURT:  All right.  Then, Mr. O'Konek, you may

3    proceed with argument both as to the probable cause question

4    and the detention question.

5          MR. O'KONEK:  Yes, Your Honor.  Regarding first the

6    preliminary hearing, the probable cause inquiry for the four

7    elements -- or, excuse me, the six elements for assault with a

8    dangerous weapon, on the 10th of February, this last Saturday,

9    of 2018, according to Mister -- or Sergeant Cody Smith, excuse

10   me, and the photographs that were presented; one, the defendant

11   did assault another person, Zachariah Walker.  That is the

12   testimony of Sergeant Smith, talking about what Zachariah

13   Walker talked about, how he had been stabbed by a knife from

14   Mr. Murshedi.

15         Coya Walker, his mother, saying that Mr. Murshedi had

16   chased Mr. Zachariah Walker with a -- with a machete, and also

17   the injuries that -- you can look at the injuries.  It appears

18   that Mr. Zachariah Walker has a cut to his left -- right above

19   -- right near the elbow, to his forearm that's pretty deep that

20   looks like it's caused by a large knife, and also has defensive

21   wounds on his fingers, which also appear to have been caused by

22   a -- by a knife.

23         A knife is a dangerous weapon.  Although one was not

24   found in this case, the wounds themselves speak for that being

25   a knife.  They found a -- law enforcement found a sheath that

1    would have carried a large knife, and additionally the

2    witnesses, two of them saw a knife wielded by Mr. Murshedi.

3              Three, the defendant intended to cause bodily harm.

4    The ongoing confrontation that's been happening for at least a

5    year between the Beston family, to which Mr. Murshedi is

6    married into, and the Walker family demonstrate that there's

7    potential motivation.  Understanding there might be an argument

8    for self-defense, that's not the appropriate forum here.  It is

9    probable cause.  And according to everybody, to include Mr.

10   Murshedi, there was a -- there was a scuffle, and it appears

11   from all of the testimony that Mr. Murshedi intended to cause

12   bodily harm, and, in fact, did cause bodily harm to Zachariah

13   Walker.

14             And in terms of the -- Mr. Murshedi is a non-Indian

15   person.  He's not enrolled with a federally-recognized tribe,

16   and Mr. Walker is.  He's an Indian person out of Fort Belknap,

17   and the area of Twins Buttes is part of the Fort Berthold

18   Indian Reservation, so the United States has demonstrated

19   probable cause in this case for assault with a dangerous

20   weapon.

21             In terms of detention, we'd request detention for Mr.

22   Murshedi for five main reasons.  His history and

23   characteristics show he has a lengthy criminal history that

24   involves both violent and drug offenses.  He's been convicted

25   of homicide, possession with intent to deliver cocaine, battery

38

1  offenses, and trafficking cannabis.  And just looking through

2  his criminal history, it appears Mr. Murshedi has been in and

3  out of prison most of his adult life.  Based upon my

4  calculation, Mr. Murshedi would be a career offender under the

5  guidelines.

6         In terms of the third point, he's a danger to the

7  community, and I think that's been demonstrated by clear and

8  convincing evidence, that he has violent tendencies towards the

9  Walker family, to specifically include Mr. Zachariah Walker.

10  And he didn't cause -- he did cause harm to him, and his

11  outbursts after the fact, saying if he -- basically he -- they

12  better watch out if he gets out demonstrates why he needs to be

13  detained for not just the safety of Mr. Walker, but the entire

14  Twin Buttes community.

15         He also may attempt to intimidate Mr. Walker and Coya

16  Walker if he were released, and that's based upon the

17  statements that he made.

18         And, lastly, the weight of the evidence is strong.

19  Although one could argue for a self-defense argument, the

20  witnesses place Mr. Murshedi with a large knife or machete in

21  his hand.  Along with Mr. Murshedi's criminal history, it shows

22  that this was not a mistake and this was not self-defense, and

23  we'd argue that all of those five reasons weigh in favor of

24  detention, Your Honor.

25         THE COURT:  Thank you.  Ms. Monteiro.

39

1           MS. MONTEIRO:  Your Honor, I would defer to the Court

2     on the issue of probable cause.

3           But I would like to make an argument that Mr.

4     Murshedi -- Murshedi should be released at this time and he

5     should not be detained.  I think there's two things going on

6     here.  First of all, he's not a danger to the community if he

7     would be released, and second of all, he's not a risk to not --

8     to not appear in court.

9           Regarding his past record, I think the last

10    assaultive-type behavior I see here is from 2007.  He's got a

11    misdemeanor battery conviction, so that's, you know, over ten

12    years old that any type of assaultive conduct has happened with

13    Mr. Murshedi.

14          I -- you know, obviously there's ongoing disputes

15    going on between these two groups of people to the point that

16    people are pulling guns on each other.  The other side is

17    pulling guns on Mr. Murshedi's family and Mr. Murshedi here.

18          In this particular incident we've got allegations of

19    a knife that's never found.  We have allegations that the other

20    side had a bat, and we have allegations that somebody was going

21    to get a gun, so it seems like this is a very chaotic

22    situation.  At this point we can't really determine who the

23    aggressor was.

24          And there appear to be legitimate, you know,

25    self-defense arguments, and there appear to be even some

1    dispute as to whether a knife was even involved in this

2    situation, at least, you know, on Mr. Murshedi's part.

3            So I would suggest that perhaps if the Court would be

4    willing to release Mr. Murshedi, that he would go not -- I

5    realize it's probably difficult for him to go back to that

6    trailer, but perhaps he could go stay with the grandmother or

7    the mother, who don't live directly next-door to these people,

8    and that would kind of alleviate some of the tension going on

9    between these people and, you know, protect the community from

10   any further type of altercations going on with these people.

11           As far as his risk to not reappear, he has got ties

12   to the community.  He -- his significant other -- he's married

13   like in a common-law Native American way to this woman, this

14   Shannon Beston, and she's three months pregnant.  He's got good

15   relationships, he tells me, with both her grandmother and her

16   mother.

17           So he -- he's been in the community for about a year.

18   Since August of 2016 he's been up here in North Dakota.  He

19   came to work, he said.  I don't see that he has a history of

20   failure to appears, so I think that he should not be detained.

21           I think that he is not a danger.  And any type of,

22   you know, risk to the community or risk of further, you know,

23   altercations here could be mitigated by Mr. Murshedi staying

24   with the grandmother or the mother.

25           And I don't think we have to worry that Mr. Murshedi

41

1    will not appear because he has a wife that's pregnant, and then

2    he's not going to run away from that situation, that family.

3    So that's what I'd ask the Court to do, is to release him under

4    the conditions that I laid out.

5            THE COURT:  Thank you.  Mr. O'Konek, is there

6    anything you wanted to add in rebuttal?

7            MR. O'KONEK:  No, Your Honor.

8            THE COURT:  All right.  I do find probable cause.  I

9    find that the evidence establishes each of the elements of the

10   offense which is charged in the Complaint.

11           And at this time I'm going to grant the government's

12   motion for detention pending conclusion of the case for the

13   reasons outlined in Ms. Kruger's report.  And I will be issuing

14   a written order to that effect.

15           Mr. O'Konek, is there anything else to be addressed

16   this morning?

17           MR. O'KONEK:  No, Your Honor.

18           THE COURT:  Ms. Monteiro, anything else?

19           MS. MONTEIRO:  No, Your Honor.

20           THE COURT:  All right.  Thank you, all.  We're

21   adjourned.

22           (Proceedings concluded at 10:46 a.m., the same day.)

23                   - - - - - - - - - -

24

<u>CERTIFICATE</u>

State of North Dakota   )

                        ) ss

County of Burleigh      )


        I, Sandra E. Ehrmantraut, do hereby certify that the

foregoing and attached typewritten pages contain an accurate

transcription, to the best of my ability, of said digital

recording made at the time and place herein indicated.

        Dated:  April 12, 2018


                            _____

                            Sandra E. Ehrmantraut